## LUIS TERRAZAS V. GEORGE M. HOLMES ET AL.

### No. 3605. Decided June 24, 1925.

#### (275 S. W., 392).

**1.—International Law—Case Followed.**

The rules of international law applicable to belligerents and de jure and de facto governments announced in Compania Minera Ygnacio Rodriguez Ramos, S. A., v. Bartlesville Zinc Company, ante, p. 21, are approved and followed, but distinguished. (Pp. 44-46.)

**2.—Same—Recognition.**

The recognition of a foreign insurrectionary government as that of a foreign state, whose acts must be given validity, is a political matter in the hands of the Federal Government and is to be distinguished from the mere recognition of belligerent rights in the revolution. (P. 45.)

**3.—Same.**

The successful revolution led by V. Carranza against the Government of Mexico by President Huerta having been acknowledged by the Government of the United States and the former recognized as President, courts of Texas will treat the acts done by authority of his government as those of the Republic of Mexico and to be respected as such. (Pp. 43-46.)

**4.—Same—Confiscation of Property.**

The confiscation of property of a citizen of the State of Chihuahua,

Mexico, by proclamation of Francisco Villa, as military governor thereof under the authority of the Government of Mexico by President Carranza, such government having been accorded recognition by that of the United States, is to be held by the courts of Texas as having divested the title of the owner and placed it in the State.   (Pp. 44, 45.)

5.—Same—Recovery of Property—Title—Possession.

Property acquired by the government of a state from one of its citizens by confiscation for disloyalty being brought into Texas by one who had acquired possession thereof, the original owner could not recover it from him by action here. It was immaterial how irregularly it had been transferred to the hands of its present possessor. His possession entitled him to defeat the suit of the former owner by showing that the latter had lost his title, whether defendant had lawfully acquired it or not. (Pp. 43, 44.)

Error to the Court of Civil Appeals for the Eighth District, in an appeal from El Paso County.

Terrazas sued Holmes and others, and appealed from a judgment for defendants. The action was for recovery of cattle brought into Texas from Mexico, where they had once been the property of plaintiff. They were sequestered by plaintiff and replevied by defendants. The Court of Civil Appeals affirmed the judgment (225 S. W., 848) and appellant obtained writ of error.

*Waters Davis* and *J. M. Goggin,* for plaintiff in error.

Since the instrument, itself, provides that other proceedings should be had before the title would otherwise vest, the court could not properly hold that the decree was self-acting, and that it vested title in the Mexican government. Fire Dept. v. Kip, 10 Wend. (N. Y.), 267; Tracy v. Corse, 58 N. Y., 149; United States v. 1960 Bags of Coffee, 8 Cranch, 398, 3 L. Ed., 607; 19 Cyc., 1363.

In construing a written instrument or law, "the intent is to be gathered from the context of the entire act, as showing its general purpose, taking particular words in the sense in which, looking to the entire act, they appear to have been used, rather than according to their accepted lexicographic definition." State ex. rel. Rosenblatt v. Sargent, 12 Mo. App., 228; Ware v. Hylton, 3 Dall., 199, 1 L Ed., 568; City of Houston v. Potter, 41 Texas Civ. App., 381, 91 S. W., 392.

The court erred in finding that the purpose of the decree was to vest *title* in the Mexican government, for the reason that the Mexican government, itself, construes said degree, not as vesting title in it, but as a decree of designation; not as giving the government title to the properties, but as giving it the right to intervene, or giving it supervision over the properties. 36 Cyc.,

1141-1142; San Antonio St. Ry. Co. v. Adams, 87 Texas, 125, 26 S. W., 1042; United States v. Sherebeck, Fed. Cases, No. 16275.

The court erred in finding that the purpose of the decree was to divest title of the persons named in the decree to the property therein specified, and to vest same in the government, for the reason that Judge Gandara, a Mexican lawyer of learning, with extensive knowledge of the Mexican laws, testified, without contradiction, that under the laws of Mexico and a proper construction of said decree, the same did not divest title out of Terrazas, nor vest it in the Mexican government. "Foreign decrees cannot be judicially noticed, but, like foreign laws, must be proved like facts in each particular case, and the existence and abstract meaning of such decree must, in general, be determined from the testimony of expert witnesses." The Asiatic Prince, 108 Fed., 287; Mex. Natl. Ry. v. Slater, 115 Fed., 608; Mex. Natl. Ry. v. Slater, U. S., 48 L. Ed., 904; Railway v. Chantry, 136 Fed., 321; Badische, Anilin & Soda Fabrick v. A. Klipstein & Co., 125 Fed., 545; Sierra Madre Construction Co. v. Brick, 55 S. W., 521.

Under the provisions of The Hague Treaty, confiscation of private property on land is prohibited, so that the efforts of a revolutionary faction to confiscate property would not divest title of the prior owner.

The court erred in holding that the decree was one of confiscation; that the chief of a revolutionary faction had the right to confiscate property and "that the confiscation decree and seizure of the cattle by the Carranza government completely divested title to the property," for the reason that such holding of the court is contrary to international laws, the laws of war, and to the provisions of The Hague Treaty. Oetjen v. Central Leather Co., 246 U. S., 297, 40 Cyc., 322; 15 Ruling Case Law, Sec. 61, Art. 46, Hague Treaty; United States v. Rauscher, 119 U. S., 407, 30 L. Ed., 428; Teti v. Consolidated Coal Co., 217 Fed., 450; De Camara v. Brooke, 135 Fed., 384.

The court erred in holding that the courts of this country have no power to inquire into the jurisdiction of a military authority to confiscate property in a foreign country, and erred in holding that a military chief may enact a decree of confiscation and thereby change title to property, for the reason that the constitution of Mexico denies the right of a person to pass laws, but confides to the legislative department such power. Williams v. Bruffy, 96 U. S., 176, 24 L. Ed., 718; Cooper v. Telfair, 4 Dall., 46, 1 L. Ed., 721; Planter's Bank v. Union Bank, 83 U. S., (16 Wall), 483, 21 L. Ed., 478; 40 Cyc., 333, 384.

If the purpose of the decree was, as found by the court, to confiscate the plaintiff's property and vest the title in the Mexican government, the decree was void under the constitution of Mexico.

Forfeitures furnish an exception to the general rule of presumption in favor of the validity of official acts; so that one claiming under a confiscation, must establish its validity by direct proof of the regularity and legality of every step necessary to its existence; since the establishment of its existence will not be aided by presumption. Irwin & Sanders v. Mayes, 31 Texas Civ. App., 517, 73 S. W., 33; Railway v. Keller, 90 Texas, 314, 37 S. W., 1065; Hill v. Still, 19 Texas, 76; 19 Cyc., 1358-9; Ency. of Ev. (Presumptions), 950 (c) ; Jones on Ev., Vol. 1, par. 540.

Where personal property is found within the jurisdiction of the court, it is within the province of the court to determine the title thereto, and the court has the power to pass upon the authority of a person to act in a foreign country, so far as his actions purport to pass title to such property. Ricaud v. American Metal Company, 246 U. S., 304, 38 S. C. R., 314; Sabariego v. Maverick, 124 U. S., 261, 31 L. Ed., 474.

The court erred in holding that "the act of the *de facto* government, now the *de jure* government of Mexico, was the act that divested plaintiff's title to the cattle in controversy in this suit," for the reason that the promulgation of the decree was not really the act of the foreign government, but the act of a person without jurisdiction and authority to make such decree. Poindexter v. Greenhow, 114 U. S., 290, 29 L. Ed., 192; Jones v. Muisbach, 26 Texas, 236; Sabariego v. Maverick, 124 U. S., 261, 31 L. Ed., 439; Planter's Bank v. Union Bank, 83 U. S., 483, 21 L. Ed., 478; 40 Cyc., 333.

A belligerent faction has no right to confiscate property, or to seize it at all, where the conditions do not urgently demand that it be taken for the benefit of the cause. 40 Cyc., 332; Mitchell v. Harmony, 13 How., 115; Dow v. Johnson, 100 U. S., 158, 25 L. Ed., 632; United States v. Russell, 13 Wall., 623, 20 L. Ed., 475; Farmer v. Lewis, 89 Am. Dec., 611, 1 Bush (Ky.), 66.

The court erred in holding that: "The Villa government lawfully succeeded to that title" (title to the cattle), for the reason that when a military chief goes into rebellion against the recognized government, all the acts of such military chief fall and become illegal, null and void, upon the failure of his revolution. Williams v. Bruffy, 96 U. S., 176, 24 L. Ed., 718; Drehman v. Stifel, 41 Mo., 208; Sprott's Case, 20 Wall., 459,

22 L. Ed., 371; Hickman v. Jones, 76 U. S., 197, 19 L. Ed., 55; Planter's Bank v. Union Bank, 83 U. S., 483, 21 L. Ed., 478; Hauet v. Doane, 79 U. S., 342, 20 L. Ed., 440; Texas v. White, 74 U. S., 700; 19 L. Ed., 227.

The seizure and sale of personal property by a faction, whose rebellion has failed, conveys no title or legal rights to the property.   40 Cyc., 332.

Defendant cannot show title in a third person so as to defeat plaintiff's right, without connecting himself with such outstanding title.  O'Brien v. Hilburn, 22 Texas, 616; Jackson v. Nelson, 39 S. W., 315; Grayson v. Boyd, 185 S. W., 651; 38 Cyc., 2062; Hunter v. Abernathy, 188 S. W., 269.

The defendant and those from whom he got the cattle being trespassers, he could not set up any claim of title in the third person, for the purpose of defeating plaintiff's recovery.   Cahn Bros. & Co. v. Barnett, 62 Texas, 674.

*F. G. Morris,* for appellees.

The decree of confiscation clearly expresses a present confiscation of title and was intended to have the effect in connection with the seizure of the ranches and the cattle thereon of divesting the title, at least to the cattle, out of Terrazas and vesting it in the Mexican government (there being a difference between the operation of confiscation decrees as to personal property from their effect on real or immovable property).  Oetjen v. Central Leather Co., 62 L. Ed. (U. S.), 726; Ricaud v. American Metal Co., 246 U. S., 304, 62 L. Ed. (U. S.), 733; Kirk v. Lind, 106 U. S., 315, 27 L. Ed., 193; Coolidge v. Guthrie, 6 Fed. Cases, p. 461, No. 3185, 1 Flippin, 97.

The power to confiscate is not limited to obtaining means of support for the army, but may be exercised to weaken the enemy by taking property from persons from whom the enemy might acquire it by force or who might voluntarily devote his means to the support of the enemy of which the conqueror is the sole judge as to the facts authorizing confiscation.   And the decree reciting that Villa has "sufficient proof relative to interventions of various capitalists of the state in late difficulties," "and as on former occasions it has been fully proved that the possession of their interest has only served to purchase traitors and assassinate rulers   *   *   *"   and "it is necessary in order to save our nation to uproot the evil, to put in force, among other proceedings for the public good, according as it may appear necessary, confiscation of properties belonging to those wicked Mexicans who have traded in human life and who are the immediate

cause of the shedding of our blood," sufficiently shows that one of the main purposes of the confiscation was to deprive the enemy of the support the property in question might give. Coolidge v. Guthrie, 6 Fed. Cases, p. 461, No. 3185, 1 Flippin, 97.

Whether the confiscation may be justified under the laws of war and usages or not may not be the subject of inquiry in the courts of this country. Certainly the civil constitution and laws of Mexico, against which Carranza carried on his war, imposed no limitations on the war powers of the revolutionary forces. There is no limit to the war power of the supreme military authority of an organization of war with another organization. The usages of war and civilized customs are only morally binding, and no neutral country can sit in judgment on the validity of the acts of the supreme sovereign power in a given territory, and hold its acts void because it violates the rules of civilized warfare or even the laws of its own government. New Orleans v. N. Y. Mail Steamship Co., 20 Wall., 387, 22 L. Ed., 358; Hefferman v. Porter, 6 Cold. (Tenn.), 391, 98 Am. Dec., 460; Brown v. United States, 3 L. Ed., p. 510, margin p. 128; Oetjen v. Central Leather Co., 62 L. Ed., 726; Ricaud v. American Metals Co., 246 U. S., 304, 62 L. Ed., 733.

It is immaterial whether the decree be regarded as a military or a non-military act. It was the act of the sovereign, the supreme authority over the State of Chihuahua at the time it was made, and its validity may not be inquired into by the courts of another country. The acts of the citizens of Mexico with reference to other citizens or foreigners, and the laws of Mexico affecting the title to property brought into this country may, as between the citizens not claiming against the sovereign action, be passed on in deciding the title of the claimant of property brought into the country, but the act of the sovereign in taking over property to itself and passing title to another cannot be reviewed and set aside by the courts of this country upon any theory that the sovereign had no authority under the constitution and laws of the country to do as he did. Oetjen and Ricaud cases cited above and authorities cited in them; Underhill v. Hernandez, 168 U. S., 250, 42 L. Ed., 456; American Banana Co. v. United States, 213 U. S., 347, 53 L. Ed., 826.

No formal decree of confiscation was necessary to the confiscation of Terrazas cattle, which were movable property, but the confiscation was effective from the time General Villa took possession of them with intent to appropriate them as an act of war. The title passes in such cases by the actual taking of

personal property with intent to appropriate it. The confiscation of the cattle of Terrazas, who was regarded by Villa as a public enemy, was, therefore, according to the date of seizure contended for by appellant, complete before the decree of a general confiscation of numerous properties, including that of Terrazas, was issued. In any event, the decree was not necessary to the completion of this confiscation. Lamar v. Brown, 92 U. S., 187, 23 L. Ed., 650; Kirk v. Lind, 106 U. S., 315, 27 L. Ed., 193; Coolidge v. Guthrie, 6 Fed. Cases, p. 461, No. 3185, 1 Flippin, 97; Halleck's Int. Law, Vol. 2, p. 75.

The proof of peaceable possession under claim of ownership by Manuel Chao of the cattle bought from him, through his representatives or assigns, by defendant Holmes, was *prima facie* evidence that Chao owned said cattle at the time Holmes purchased them, and the stipulation that Holmes purchased the cattle for a valuable consideration and acquired possession of them in October, 1915, and had possession when plaintiff seized them, makes *prima facie* proof of title in Holmes. Grooms v. Rust, 27 Texas, 231; Missouri Pac. Ry. Co. v. Cullers, 81 Texas, 382.

As the defendant Holmes did not acquire his possession of the cattle in question from Terrazas, in recognition of his title by force or fraud or from anyone who had acquired it from Terrazas by other means than what must be treated in this court as lawful, the defendant, if not having the title acquired by the Carranza government, may show, in denying plaintiff's title and right of possession, that plaintiff's title and right of possession were extinguished by confiscation before defendant acquired possession and thereby meet the issue tendered by the plaintiff in his pleading that he was the owner of the cattle when defendant acquired possession of them. Missouri Pac. Ry. Co. v. Cullers, 81 Texas, 382; Willis Bros. v. Hudson, 63 Texas, 681; Railway Co. v. Lewis, 40 L. Ed. (U. S.), 1007; Murray v. Lyons, 95 S. W., 621; 34 Cyc., 1479, Subdiv. 4; 28 Cyc., 2044 to 2450.

MR. JUSTICE PIERSON delivered the opinion of the court.

Since the facts of the case are of controlling importance, we give the findings of fact and conclusions of law found by the trial court.

## "FINDINGS OF FACT.

"In the year 1910, during the time that General Porfirio Diaz was President of the Republic of Mexico, there was a revolution started in Mexico of which Francisco Madero

was Chief.  This revolution resulted in the resignation of General Diaz, who thereupon left the Republic of Mexico.  Madero's revolution was successful, and he acquired control of affairs in Mexico and was, thereafter, elected President of Mexico.  On February 23, 1913, Francisco Madero, the President of the Republic, was assassinated, and General Victoriano Huerta seized the reins of Government, and proclaimed himself as in control of Mexico.  Venustiano Carranza, then Governor of the State of Coahuila, arose in arms against the Huerta Government, and there was a military conflict between them.  The movement directed by Carranza was successful in the North, and the military forces under Carranza, by the latter part of the year 1913, obtained complete control over the State of Chihuahua.  General Francisco Villa was the principal military commander under Carranza, and prominent in the military operations against Huerta.  When military control was obtained over the State of Chihuahua, Francisco Villa was named Military Governor thereof.

"The plaintiff, General Luis Terrazas, is a citizen of the Republic of Mexico, and had been, up to the date of the Madero revolution, Constitutional Governor of the State of Chihuahua. He was at all times an adherent of the Diaz Government, and was a soldier of distinction and ability, and a man of great weight and importance in both political and business affairs in the State of Chihuahua and throughout the Republic of Mexico. He remained in the State of Chihuahua, at the capital thereof, until the evacuation of Chihuahua by the Huerta forces, then in command of General Mercado.  When the Mercado forces evacuated Chihuahua, General Terrazas left with them overland to Ojinaga, where he crossed into the United States.  Since said time General Terrazas has been a resident of the United States, and has not returned to Mexico.  During his residence in Mexico, General Terrazas acquired great wealth. He owned several very extensive cattle ranches in the State of Chihuahua, on which he owned cattle in excess of 190,000 head.  These cattle were on his ranches in Chihuahua at the time he fled from Mexico.  The ranches and cattle were taken possession of by the military forces of Carranza and Villa on their obtaining control of the State of Chihuahua.

"Villa, by authorization of Carranza, who was  chief of the revolutionary movement, caused to be made and promulgated a Decree of Confiscation.  This Decree of Confiscation is in the Spanish language.  The following, however, is a substantial translation of same:

" 'Decree relative to the confiscation of property.

" 'Gen. Francisco Villa, First Chief of the Constitutionalist Army in the State of Chihuahua, and in conformity with the Plan of Guadalupe, Provisional Governor of the said State, in pursuance to the extraordinary powers conferred upon me, I have deemed it best to decree, as follows:

" 'Having sufficient proof relative to the intervention of various capitalists of the State, in the late difficulties that our country has been called upon to decide, producing, on account of natural defense against the exploitations and treasons, numerous victims, among whom are orphans and widows, who mourn the loss of those who were the support of those innocent beings, whose only crime was the enviable patriotism which has sustained the dignity of our country, and there being found also among them those wickedly enriched, who have defrauded by a thousand means the public treasury during more than half a century of power, by fraud and force, I believe, in justice, that the hour has arrived to render account to public vengeance, instituting in due time the procedure before which there shall be accounted for all the responsibilities that were contracted in the presence of the Mexican people. And as on former occasions it has been fully proved that the possession of their interests has only served to purchase traitors and assassinate rulers whose excessive goodness served as an incentive to their evil deeds, it is necessary, in order to save our nation, to uproot the evil, to put in force, among other proceedings for the public good, according as it may appear necessary, confiscation of properties belonging to those wicked Mexicans who have traded in human life, and who are the immediate cause of the shedding of our blood. For said reasons, which justify our attitude before the dignity of the entire world, I decree the following:

" 'First: That they are confiscable and are confiscated for the public good and for the purpose of providing pensions for the widows and orphans made so by the defense that the Mexican people have made against the enemies of the Administration, and in order to meet the liabilities arising from court procedures, and which judgments or decisions in due time will be made known by special courts, which courts for the purpose of restoring fraudulently acquired properties will be established at suitable places, fixing the amount of those liabilities, and assigning as a whole for those purposes, the personal and real properties and securities of every class belonging to the following parties: Terrazas (Luis) and sons, Creel brothers, Falomir brothers, Jose Maria Sanchez, Cuilty brothers, Lujan brothers, J. Fran-

cisco Molinar and all their households and other associates who have been interested with them in the dirty transactions and fraudulent co-operations which in former times were called politics.

" 'Second: A regulative law which shall be enacted at the triumph of our cause, shall determine the relative and equitable distribution of those properties, first pensioning the widows and orphans whose relatives may have defended the cause of justice since 1910; second, there shall be considered the defenders of our case in the proper division of those lands; there shall be made good the loss of the treasury on account of frauds committed by the parties mentioned, by failure to pay taxes during the many years that said conditions existed, and also there shall be restored to the legitimate and original owners the properties which, through weight of power, were taken from them by said parties, in this manner doing justice to each victim of the usurpation.

" 'Third: All the confiscated properties shall be administered by the State Bank, which shall keep an exact account, correctly vouchered, of the receipts and disbursements made for said purpose.

" 'Given at the Executive Palace, this, the 12th day of December, 1913.                     " 'General Francisco Villa,
                          " 'Military Governor of the State.
" 'S. Terrazas, Secretary'."

"The purpose of this decree was to divest the title of the persons named in said decree to the property therein specified, and to vest same in the Government. The property, or the funds arising from its administration, were to be devoted to the purposes specified in the decree and the mode of practically realizing these purposes was to be thereafter determined by future legislation. The decree was intended to further the cause of the revolutionary faction promulgating same by raising funds, and also by destroying the resources of its enemies. Possession was taken of the ranches and cattle of the plaintiff under and by virtue of this decree by said revolutionary government.

"On the 19th day of October, 1915, the United States recognized the Government of Carranza as the de facto government of the Republic of Mexico, and on August 31, 1917, as the de jure Government of Mexico. Prior to October 15th, 1915, General Francisco Villa refused longer to recognize the authority of General Carranza, and revolted against him. The Villa revolt, from a military standpoint, assumed considerable proportions. His

forces overran the State of Chihuahua, and drove the Carranza forces therefrom, and from the — day of ——— to about the — day of ——— he had complete control over the State of Chihuahua and other portions of the Republic, and the State was governed by regulations issued by him as a Military Chief. His forces took possession of the Terrazas ranches in Chihuahua, and the cattle thereon, and he claimed his Government had succeeded to the title acquired by the Government represented by the Carranza forces.

"In October, 1915, one General Chao, a Villa commander, had been in charge of what was known as the Sauz ranch, one of the Terrazas ranches. Defendant Holmes went to this ranch, and by purchase from the men in charge thereof, acquired the possession of the cattle in controversy herein. The cattle were brought by said Holmes to the United States, and entered the United States in the neighborhood of El Paso, Texas. Upon the entry, or shortly thereafter, they were seized under the writ of sequestration issued in this case, and thereafter same were replevied by defendant. The cattle, at the time of their seizure by the sheriff, and at all times prior thereto, were the property of General Luis Terrazas, unless his title had been divested by the decree of confiscation and the taking possession thereof by the said military forces. The cattle were taken from the possession of Holmes by the sheriff under said writ. The aggregate value of the cattle at the time of the trial was ——— Dollars.

"There was a vigorous and bloody conflict between the forces of Carranza and Villa for the control of Northern Mexico, in which the Carranza forces were ultimately victorious, and Villa lost control of the State of Chihuahua. The Villa movement accordingly lost force and character, and as a political factor, Villa was eliminated. From that time down to the present time he has maintained a guerrilla warfare, but his operations have not been militarily or politically important.

## "CONCLUSIONS OF LAW.

"The Chief of a revolutionary movement which, by military forces, acquired a fixed control over a large section of country, with the purpose of overthrowing the existing government, and establishing another, has governmental control over the territory. The orders and decrees of such a military chief, while in control of the territory, are the law of the territory so controlled. The lives and property of the inhabitants of such territory are

under the protection and control of such revolutionary government. If it seizes personal property in the territory so controlled for governmental purposes, the seizure divests the owner of the property of his title. In civil war, either of the contending factions has the power and the legal right to. seize, as enemies' property, personal property within a zone over which it acquires military control. This right is incident to the power to make war, and includes the power to carry it on by all lawful means, and the confiscation of an enemy's property is a well recognized mode of warfare. The personal attitude of the owner of the property toward the confiscating authority is in no way determinative of the status of property in this respect. The determinative element is might it in some way be of use to the enemy, or is it necessary to maintain the confiscating belligerent, or does it in some way harm the enemy. The confiscation decree and seizure of the cattle by the Carranzá Government completely divested plaintiff's title to the cattle. When Villa acquired military control over the State of Chihuahua, he succeeded to the property of the Government which he overthrew, and this property his Government might lawfully use. The act of the *de facto* foreign Government, now the *de jure* Government of Mexico, was the act that divested the plaintiff's title to the cattle in controversy in this suit. The Villa Government lawfully succeeded to that title. An American court has not the power to question the acts of a *de facto* Government of a foreign country, where those acts take place in such foreign country.

"It devolves upon plaintiff, in a suit to recover the title and possession of personal property, to show present title and present right of possession to the property. He cannot recover, even though the defendant have no title to the property, unless he show title in himself. The defendant can show any fact that disproves the facts vital to plaintiff's case, save where he directly or indirectly claims under an unlawful invasion of plaintiff's possession, in which case he cannot show title to be in another, with which he does not connect himself. Plaintiff's title was extinguished by the decree and seizure. Subsequent thereto, defendants showed a possession of the cattle acquired by purchase from parties in Mexico in possession of same. Defendants' possession of the cattle, in the absence of some showing of title in plaintiff, was sufficient to make out a *prima facie* case of title in the defendants. The judgment is in favor of the defendants."

We have concluded that the construction of the decree, together with the taking of actual possesion of the property by the forces of Carranza, and the conclusions of law as applied to the facts

of this case by the Honorable P. R. Price, Judge of the Forty-first Judicial District of Texas, and approved by the Honorable Court of Civil Appeals for the Eighth Supreme Judicial District, are correct, and that the judgments of both those courts should be affirmed. See opinion of Court of Civil Appeals, 225 S. W., 848.

The finding of facts and conclusions of law by the District Court and the Court of Civil Appeals, which convince us of the correctness of the judgments of those courts, are as follows:

"The ranches and cattle of plaintiff in error were taken possession of by the military forces of Carranza on their obtaining control of the State of Chihuahua;"

The decree copied in the statement bears the construction placed upon it by both courts, and clearly so, we think, when taken in connection with the act of seizure and the taking of possession of the "ranches and cattle of the plaintiff under and by virtue of this decree by said revolutionary government," and the fact that the decree was acted on by the agents of the Carranza government by selling cattle seized and possessed under it. The decree was officially approved by Carranza;

Possession was never regained by plaintiff in error, but passed first from the agents of the Carranza government to those of Villa, and thence to defendant in error.

The parties agreed:

"That the cattle sued for by the plaintiff were owned by him prior to December 12, 1913, the date of the decree signed by General Francisco Villa, hereinafter referred to (copied above), and were the property of plaintiff when the defendant Holmes received possession of them in the Republic of Mexico, October, 1915, unless the title of said Terrazas passed to the revolutionary government of which Venustiano Carranza was the head by virtue of said decree."

The Carranza Government was recognized by the Government of the United States as a de facto and as a de jure government.

For a discussion of the rules of international law applicable to belligerents and de facto and de jure governments, see the case of Compania Minera Ygnacio Rodriguez Ramos, S. A., v. Bartlesville Zinc Company et al., opinion delivered concurrent herewith.

In the instant case, the Carranza government in Mexico having been recognized by the political department of our government, and the cattle of plaintiff in error having been seized and possessed by the military officers under the authority of said government, and plaintiff in error thereafter showing no

renewed ownership or possession in himself, the courts are unauthorized to interfere with the possession so obtained and transmitted. Oetjen v. Central Leather Co., 246 U. S., 297, 62 L. Ed., 726; Eduardo Ricaud et al. v. American Metals Co., 246 U. S., 304, 62 L. Ed., 733.

In the first case, supra, the Supreme Court of the United States said:

"The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative— 'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision. United States v. Palmer, 3 Wheat., 610; Foster v. Neilson, 2 Pet., 253, 307, 309; Garcia v. Lee, 12 Pet., 511, 517, 520; Williams v. Suffolk Ins. Co., 13 Pet., 415, 420; In re Cooper, 143 U. S., 472, 499. It has been specifically decided that 'Who is the sovereign *de jure* or *de facto,* of a territory is not a judicial, but is a political question, the the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances.' Jones v. United States, 137 U. S., 202, 212.

"It is also the result of the interpretation by this court of the principles of international law that when a government which originates in revolution or revolt is recognized by the political department of our government as the *de jure* government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence. Williams v. Bruffy, 96 U. S., 176, 186; Underhill v. Hernandez, 168 U. S., 250, 253. See S. C. 60 Fed. 1 Rep., 577."

We have been considering together the cases of Compania Minera Ygnacio Rodriguez Ramos, S. A., v. Bartlesville Zinc Company et al., Terrazas v. Holmes and Terrazas v. Donohue. The material difference in the cases is that in the case of Compania Minera Ygnacio Rodriguez Ramos, S. A., v. Bartlesville Zinc Company et al. the seizure and taking possession of the private property (zinc ore) was done, or claimed by the defendant to have been done, by the agents of Francisco Villa as an act of the Villa faction or government in Mexico, while in the other two cases the seizing and taking possession of the private property (cattle) was done by the officers of Carranza under authority of the Carranza government.

The Villa faction or government failed to make good its right to govern; failed to established itself as a government; did not become a government; its acts fell with it, and its seizure and sale of the property passed no title. Under the principles of international law no recognition can be given its acts as being those of a rightful or lawful government.

While in the two cases last mentioned the seizure and possession of the property was by the Carranza government, which succeeded in making good its right to rule, became the rightful or *de jure* government of Mexico, and was recognized by our Government as such. The taking was by a foreign government, and the principle applied was that "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."

These distinctions are clear, and each case is ruled by the same principle as applied to the facts of each case. Title did or did not pass according to the recognition to be given the acts of each as a foreign government.

The judgment of the Court of Civil Appeals is affirmed.

*Affirmed.*